IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DR. ROBERT J. HENDERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:11-CV-1992-D |
| VS. | § | |
| | § | *This memorandum opinion and order was |
| THE PAUL REVERE LIFE | § | filed unsealed on May 6, 2013 after the parties |
| INSURANCE COMPANY, et al., | § | agreed that no part needed to remain under seal. |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this suit by a physician to recover total disability benefits under two insurance policies through state-law breach of contract and declaratory judgment claims, or, alternatively, under ERISA,[1] the court must resolve three motions. These motions present the questions whether the plaintiff-physician's state-law claims are preempted, whether the defendants-insurers' summary judgment evidence should be stricken, and whether the defendants-insurers are entitled to summary judgment on the merits of the physician's claims. For the reasons that follow, the court holds that the physician's state-law breach of contract claim based on one policy is not preempted under ERISA and that his breach of contract claim based on the other policy is preempted. The court raises *sua sponte* that, to the extent it is not preempted, the physician's declaratory judgment action should be dismissed. And it holds that the defendants-insurers are not entitled to summary judgment on the merits of

_____

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461.

the physician's claims under state law or ERISA.

## I

## A

This is an action by plaintiff Robert J. Henderson, M.D. ("Dr. Henderson")—a spine surgeon—against defendants The Paul Revere Life Insurance Company ("Paul Revere") and The Great-West Life Assurance Company ("Great West") seeking total disability benefits under policies issued by Paul Revere and Great West.  Dr. Henderson alleges claims for breach of contract based on both policies.  He also requests that the court declare his rights to disability benefits under the policies.  Alternatively, if the court determines that either policy is preempted under ERISA, he asserts a claim for disability benefits under ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1).

Dr. Henderson organized Dr. Robert J. Henderson M.D., P.A. ("Henderson PA") in 1980.[2]  He was the sole owner, member, officer, and director of Henderson PA until it was dissolved in 1991.  Henderson PA provided Dr. Henderson and all of its other employees with group health insurance benefits and a pension plan.  A July 31, 1986 document entitled "Corporate Disability Income Plan Resolution" ("Resolution") provided that "this

--------

[2]In recounting the factual background, the court summarizes the evidence in the light most favorable to Dr. Henderson as the summary judgment nonmovant and draws all reasonable inferences in his favor.  *See, e.g.*, *Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).  Where the court recounts evidence that defendants have introduced, Dr. Henderson either has not objected to or moved to strike the evidence, or the court has explicitly overruled the objection or motion.

corporation will establish a corporate health plan . . . and will offer to qualified employees this health plan in return for the services rendered by those employees to the corporation." Ds. 6/27/12 App. 33.

In 1986 Dr. Henderson obtained a disability insurance policy from Great West ("Great West Policy"). The Great West Policy was owned initially by Henderson PA, but when that entity dissolved in 1991, the policy reverted by Dr. Henderson personally.

From 1988 through January 1993, Dr. Henderson was employed by Dallas Spine Group ("DS Group"). In June 1992 DS Group established the Dallas Spine Center Employee Welfare Benefit Trust ("DSC Trust"). In November 1992 Dr. Henderson obtained an individual disability insurance policy from Paul Revere ("Paul Revere Policy") as part of an employee security plan ("ESP").[3] Four other physicians also obtained policies through Paul Revere as part of the ESP. As part of the ESP, DS Group remitted the premiums for the individual policies through a list bill. By virtue of DS Group's ESP and list bill, Paul Revere provided a "Select Multi-Life discount" of 15% for all participating policies. Approximately two months after the Paul Revere Policy was issued, Dr. Henderson left DS Group and started his own practice. Shortly thereafter, the Paul Revere Policy lapsed.

In January 1993 Dr. Henderson learned that Henderson PA had been dissolved. He organized a professional association ("Second Henderson PA") under the same name as Henderson PA. In March 1993 he changed the name of Second Henderson PA to Robert

---

[3]An ESP is established to provide group benefits to members through an employer, resulting in a reduction of premium for the members of the ESP.

James Henderson, M.D., P.A.  And in 1999 he changed the name again, this time to Dallas Spine Care, P.A." ("DS Care").  Despite the name changes, Dr. Henderson remained the sole owner, member, officer, and director of this entity from its inception in 1993.  He was the only individual employed by Henderson PA, Second Henderson PA, or DS Care who owned a disability policy from Great West.

In July 1993 Paul Revere notified Dr. Henderson by letter that the Paul Revere Policy had been marked "No Longer in Force" as of March 1, 1993 and that he was required to submit a reinstatement application to place the coverage back in force.  The Paul Revere policy was reinstated later in 1993.  At the time, Dr. Henderson was the sole owner, director, member, and officer of Second Henderson PA, the entity whose name became DS Care. Paul Revere did not insure any other employee of Second Henderson PA or DS Care.  DS Care was dissolved in 1999.

According to Dr. Henderson's second amended complaint, he submitted a claim for total disability in February 2009.  In July 2010 this claim was denied.  Dr. Henderson appealed, but his appeals were denied in February 2011.  This lawsuit followed.

B

Defendants move for summary judgment in two motions.  In the first—which they filed as a motion for determination of applicability of ERISA and to dismiss preempted claims, and which the court converted to a motion for partial summary judgment[4]—they

---

[4]The court notified the parties by July 13, 2012 order that the motion would be treated as a motion for partial summary judgment.

contend that the Great West Policy and the Paul Revere Policy are parts of employee benefit plans governed by ERISA. They therefore maintain that Dr. Henderson's state-law claims are preempted under ERISA (under both conflict preemption and complete preemption); that he must recover, if at all, under § 502 of ERISA; and that his jury demand should be stricken because there is no jury trial right for the equitable remedy that ERISA provides. Defendants ask the court to hold that Dr. Henderson's claims are governed by ERISA, to dismiss his state-law claims, to strike his jury demand, and to decide his ERISA claims on cross-motions for summary judgment, based on the administrative record.

In their second motion—a motion for partial summary judgment on the disability claim—defendants maintain that they are entitled to summary judgment holding as a matter of law that Dr. Henderson is not totally disabled under the Great West Policy and the Paul Revere Policy.

Dr. Henderson opposes both motions. He also moves to strike in their entirety the declarations of Donna Dinsmore ("Dinsmore"), Clark Hornbaker ("Hornbaker"), Joye Lawson ("Lawson"), and Diane Gardner ("Gardner"), or to sustain objections to their testimony.

## II

The court first addresses Dr. Henderson's motion to strike summary judgment evidence.

## A

Dr. Henderson objects to four declarations attached to defendants' motion for partial

- 5 -

summary judgment: of Dinsmore, an underwriting consultant for Unum Group, of Hornbaker, the former Executive Director of DS Group; of Lawson, the former Chief Financial Officer of DS Group, and of Gardner, a manager of Unum Group.[5]

B

Dr. Henderson objects generally to Dinsmore's declaration on the grounds that it is conclusory, speculative, and without any foundation or evidentiary support. On the same or substantially similar grounds, he also objects to statements about DS Group's interactions with the Paul Revere Policy. Defendants respond that the declaration is not conclusory or speculative because Dinsmore has personal knowledge of the Paul Revere Policy from her review of the underwriting files.

Under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "Conclusory allegations, speculation, and unsubstantiated assertions are not evidence." *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (citing *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)). The court denies Dr. Henderson's motion to strike Dinsmore's declaration because it is based on personal knowledge that she derived from her review of the underlying documents. *See Perdomo v. Fed. Mortg. Ass'n*, 2013 WL 1123629, at *2 (N.D. Tex. Mar. 18, 2013) (Lynn, J.)

_____

[5]The court need not address objections to the declarations that pertain to evidence that the court is not considering in deciding the merits of defendants' summary judgment motion.

(concluding that declaration was supported by personal knowledge because declarant reviewed records in case).  *Cf. Carson v. Perry*, 91 F.3d 138, 1996 WL 400122, at *1 (5th Cir. June 6, 1996) (per curiam) ("We have held that an affidavit can adequately support a motion for summary judgment when the affiant's personal knowledge is based on a review of her employer's business records and the affiant's position with the employer renders her competent to testify on the particular issue which the affidavit concerns.").  Dinsmore avers that she reviewed the files, is aware of their contents, and has knowledge of the facts stated in her declaration.[6]

As for Dr. Henderson's specific objections to Dinsmore's statements about the Paul Revere Policy, these averments are also supported by personal knowledge.  Dr. Henderson appears to object on the basis that these statements lack evidentiary support and are conclusory.  Yet the statements in question only relate the contents of the documents that Dinsmore reviewed, or draw reasonable inferences from these documents based on her knowledge and experience as an underwriting consultant, and are therefore admissible.  *See United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999) ("Personal knowledge can include

---

[6]Dinsmore states:

> I have reviewed Paul Revere's underwriting files in connection with [Dr. Henderson's policy] which contains business records maintained by Paul Revere and Unum Group in the course of their business and know that file's contents.  In my capacity as Underwriting Consultant, I have knowledge of the facts stated in this declaration, all of which are true and correct.

Ds. 6/27/12 App. 36.

inferences and opinions, so long as they are grounded in personal observation and experience." (quoting *United States v. Neal*, 36 F.3d 1190, 1206 (1st Cir. 1994)). Statements from her declaration, such as that, "because the Great-West Policy was paid for by [Dr.] Henderson's employer, he was entitled to a larger monthly benefit than he would have otherwise qualified for," Ds. 6/27/12 App. 38, are within her personal knowledge and are admissible.[7]

C

Dr. Henderson moves to strike Lawson's and Hornbaker's declarations in their entirety, contending they are speculative based on their recollection of facts from approximately 20 years ago, and are unsupported by evidence. Alternatively, he moves to strike specific statements. The court concludes, however, that both declarants have personal knowledge of the facts contained in their respective declarations. Dr. Henderson's objection appears to be only that the facts about which they have personal knowledge occurred many years ago and that the declarations are not accompanied by supporting documentary evidence. This objection goes to the weight of the evidence, not to its admissibility. *See, e.g., Kelly v. Paschall*, 2005 WL 5988648, at *4 (W.D. Tex. Apr. 19, 2005) (holding that complaints about doctor's memory went to weight, not admissibility, of his opinion). The declarations are therefore admissible summary judgment evidence, and Dr. Henderson's

---

[7]Although Dr. Henderson asserts that "Defendants cannot be allowed to substitute a declarant's statements for documents that have not been produced," he does not clearly make a best evidence objection under Fed. R. Evid. 1002. The court holds that any such objection that could have been made has been waived.

motion to strike is denied in this respect.

D

Dr. Henderson also objects to Gardner's declaration on the basis of relevance, contending that it addresses the details of the Unum plan. The court concludes that the declaration is relevant insofar as it relates to whether a plan exists. Accordingly, the court denies the motion to strike as it relates to Gardner's declaration.

III

To decide defendants' first motion for partial summary judgment—i.e., whether Dr. Henderson's claims are governed by state law or under ERISA—the court must determine whether the Great West Policy and/or the Paul Revere Policy is part of an ERISA plan.

"We have frequently stated that the existence of an ERISA plan within the statutory definition is a question of fact. However, where the factual circumstances are established as a matter of law or undisputed, we have treated the question as one of law to be reviewed de novo." *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 448 (5th Cir. 2007) (citations omitted). "It is clear that, while not so stating, [the Fifth Circuit has] followed [its] sister circuits in treating the existence of an ERISA plan as a mixed question of fact and law." *Id.* at 449. This court therefore concludes that the question whether insurance policies such as the ones at issue here are part of ERISA plans is a mixed question of fact and law. If there is no genuine issue regarding a fact that is pertinent to this inquiry, the court decides as a matter of law whether the policy is part of an ERISA plan. If there is a genuine issue of fact, however, the trier of fact must resolve the issue before the court can determine based on the

facts so found, and as a matter of law, whether the policy is part of an ERISA plan.

When a party moves for summary judgment on a claim for which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the opposing party must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citation omitted). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at 1076.

## IV

Defendants first move for partial summary judgment on the ground that Dr. Henderson's state-law claims are completely preempted under ERISA because each disability policy is part of an ERISA employee benefit plan.

## A

"Whether ERISA preemption applies regarding a particular insurance policy depends on whether the policy is properly classified as an employee welfare benefit plan under the

terms of the statute." *Meyers v. Tex. Health Res.*, 2009 WL 3756323, at *3 (N.D. Tex. Nov. 9, 2009) (Fitzwater, C.J.); *Magallon-Laffey v. Sun Life Assurance Co. of Canada*, 2001 WL 1082414, at *2 (N.D. Tex. Aug. 28, 2001) (Fitzwater, J.). Under ERISA, an "'employee welfare benefit plan' . . . mean[s] any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . benefits in the event of sickness, accident, disability [or] death." 29 U.S.C. § 1002(1). To qualify, a plan must (1) exist, (2) not fall within the safe harbor provisions established by the Department of Labor, and (3) satisfy the ERISA requirements of establishment and maintenance by an employer with intent to benefit employees. *House*, 499 F.3d at 448 (citing *Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir. 1993)).

B

The court considers first the Great West Policy.

1

At issue with the Great West policy is the third prong of the test, which requires that the plan "satisfy the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer intending to benefit employees." *Id.* at 450. This requires that "the plan must provide benefits to at least one employee, not including an employee who is also the owner of the business in question." *Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102, 1104 (11th Cir. 1999) (citations omitted); *see also* 29 C.F.R. § 2510.3-3(b) ("the term

'employee benefit plan' shall not include any plan, fund or program . . . under which no employees are participants covered under the plan."); 29 C.F.R. § 2510.3-3(c)(1) ("An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse.").

Dr. Henderson maintains that he was the sole owner of Henderson PA and was the only person covered under the Great West Policy.  He argues that, under 29 C.F.R. § 2510.3-3(b) and (c)(1), he could not be considered an employee and that the Great West Policy falls outside ERISA.

Defendants respond that the court should consider not only the Great West Policy but the other employee benefits, including health insurance, that Henderson PA provided to its other employees.  They point to the Resolution and argue that it "expressly relates the disability benefits *and* a 'corporate health plan' for both employees and 'executive employees.'" Ds. 8/15/12 Reply 11 (emphasis in original).  Defendants argue the Henderson PA's "corporate health plan" was a group health insurance policy issued by United HealthCare that insured Dr. Henderson and all other employees of the Henderson PA.  They maintain that Henderson PA's group health insurance policy is related to the disability benefits through the Resolution.

2

A sole proprietor's purchase of insurance for himself and his spouse does not subject

the policy to ERISA. *Raymond B. Yates, M.D., P.V. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 21 (2004) ("Plans that cover only sole owners or partners and their spouses, the regulation instructs, fall outside Title I's domain. Plans covering working owners and their nonowner employees, on the other hand, fall entirely within ERISA's compass." (footnotes and citations omitted)). Moreover, when an owner purchases a policy benefiting only the owner and no other employees, the policy is not part of an ERISA plan simply because benefits are also provided, through different policies, to nonowner employees. For example, in *Slamen* the Eleventh Circuit addressed whether a disability insurance policy purchased by the plaintiff's solely-owned dental practice and benefiting only the plaintiff was an ERISA plan by virtue of the dental practice's having established a health plan providing health insurance coverage for the plaintiff and his employees several years before the purchase of the disability insurance policy. *Slamen*, 166 F.3d at 1103. The court concluded that the disability insurance policy was not an ERISA employee welfare benefit plan because "[n]o employees received any benefits under the plan and there is nothing in the record showing that the disability insurance policy bears any relationship to the health and life insurance benefits that [the plaintiff] provides to his employees." *Id.* at 1105. The court explained that "non-ERISA benefits do not fall within ERISA's reach merely because they are included in a multibenefit plan along with ERISA benefits." *Id.* at 1105 (quoting *Kemp v. IBM Corp.*, 109 F.3d 708, 713 (11th Cir. 1997)). Benefit programs must be analyzed separately "absent evidence . . . showing that the two programs are related." *Id.* at 1106.

The court noted that "the two policies were purchased at different times, from different insurers, and for different purposes.  The first policy cover[ed] [plaintiff's] employees as well as himself, while the second policy only cover[ed] [plaintiff] and was not designed to benefit [plaintiff's] employees."  *Id.* at 1105.  *See also Robertson v. Alexander Grant & Co.* 798 F.2d 868, 871-72 (5th Cir. 1986) (holding that similar plans should not be considered together for purposes of ERISA where the "plan covering the partners does not pay any benefits to principals, and the plan covering principals does not pay any benefits to partners").

In *House* the Fifth Circuit was presented with the argument that a multi-class group insurance policy—in which one class comprised only owners or partners—did not constitute an ERISA plan.  The panel distinguished *Slamen* and other similar cases on the basis that, in those cases, "separate and distinct plans were maintained exclusively for owners."  *House*, 499 F.3d at 451.  In contrast, in *House*

> the partner-class disability coverage was part of a comprehensive employee welfare benefit plan covering both partners and employees.  The AUL life and disability insurance was bargained and paid for as a package by the firm, through a single subscription agreement resulting in a group policy.  The policy contemplate[d] and establish[d] a single plan, with the only distinctions between classes being the method of determining pre-disability earnings—since partners' variable, non-salary income would have to be calculated differently—and a more generic disability description to accommodate the variable occupations of the non-attorney participants.  The rights of House as well as all non-partner attorneys and firm employees, while spelled out in their individual certificates of insurance, arose from the group policy.

*Id.* at 451-52.  Accordingly, the panel held that "the non-partner and partner-class life and

- 14 -

disability coverage [were] sufficiently related and intertwined as to constitute one overall benefit plan" governed by ERISA. *Id.* at 452.

It is undisputed that the Great West Policy covered only Dr. Henderson and that he was the sole owner of the Henderson PA. Although defendants argue that the Great West Policy was "part of the [Second Henderson PA]'s comprehensive welfare benefit plan . . . as described in the [Resolution]," the summary judgment evidence is insufficient to "link[] the health and disability coverage for owner and non-owner employees," Ds. 8/15/12 Br. 12, and therefore no genuine fact issue that precludes the court from deciding the ERISA coverage issue as a matter of law. The Resolution states, in relevant part:

> [w]hereas, it is the desire of the corporation . . . to relieve the minds of its employees, including its executive employees, of a lack of sufficient income during periods of disability . . . this corporation will establish a corporate health plan . . . and will offer to qualified employees this health plan in return for the services rendered by those employees to the corporation.

Ds. 6/27/12 App. 33. Dr. Henderson testified that Henderson PA provided group health insurance to its employees beginning in 1980, "probably [through] United HealthCare." Ds. 6/27/12 App. 10. In contrast, the Great West Policy was purchased in 1986, from Great West, for the benefit of Dr. Henderson only. As in *Slamen*, the two policies were purchased from different insurers, for different purposes, at different times. *See Slamen*, 166 F.3d at 1105. The statement of an intent to create a "corporate health plan" to be offered to "qualified employees," with no further reference to health insurance or to the United HealthCare group health insurance would not permit a reasonable trier of fact to find that the

- 15 -

Great West Policy was related to any other plan for benefits offered to Henderson PA's other employees. *See Meredith*, 980 F.2d at 353, 357 (concluding that plan purchased by business owner that covered only owner and her husband did not constitute ERISA plan even though policy at issue "allowed coverage for any new employee who so chose after 90 days of employment," because "there were then none, and none were hired thereafter.").  In other words, the summary judgment evidence would only reasonably permit the finding that the health insurance policy obtained from United HealthCare when Dr. Henderson first started Henderson PA in 1980 was in no way related to the Great West Policy that Dr. Henderson obtained for himself in 1986.[8]

Because the Great West Policy covered only Dr. Henderson (the owner of Henderson PA) and no other employees, and because there is no evidence that would reasonably permit a finding of a relationship between the Great West Policy and any other specific insurance or benefits offered to Henderson PA's other employees, the court concludes as a matter of law that the Great West Policy is not part of an ERISA plan.

## C

The court next considers whether the Paul Revere Policy is part of an ERISA plan.

---

[8]Defendants' reliance on *House*, 499 F.3d at 451-52, for the proposition that the court should consider the Great West Policy to be part of a comprehensive welfare benefit plan covering both an owner and multiple nonowner employees is misplaced.  In *House* the plan at issue involved life and disability insurance "bargained and paid for as a package by the firm, through a single subscription agreement resulting in a group policy . . . [that] contemplate[d] and establishe[d] a single plan, with the only distinctions between classes being the method of determining pre-disability earnings."  *Id.* at 451-52.  The summary judgment record in this case does not contain similar facts.

1

The parties do not appear to dispute the first element of the three-prong test: the existence of a plan. Defendants have adduced evidence from which "a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits" under the DSC Trust. *See Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240-41 (5th Cir. 1990) (adopting *Donovan v. Dillingham*, 688 F.2d 1367, 1374 (11th Cir. 1982) (en banc)).

2

The court considers under the second prong whether the Paul Revere Policy falls within the safe harbor provision established by the Department of Labor.

Under the safe harbor provision, a group or group-type insurance program will not be considered an ERISA plan if (1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer; and (4) the employer receives no profit from the plan. 29 C.F.R. § 2510.3-1(j). The plan must meet all four criteria to be exempt from ERISA.

Regarding the first element, defendants argue, *inter alia*, that DS Group "contributed" to the plan by (1) "pa[ying] the premiums for the Paul Revere Policy," (2) providing its employees with a 15% discount on their premiums through the ESP, and (3) shouldering the administrative burden of tracking and remitting premiums. Ds. 6/27/12 Br. 14-15. In response, Dr. Henderson disputes that DS Group ever funded premium payments on the Paul

Revere Policy, maintaining that DS Group's role was strictly limited to collecting and remitting premium payments through payroll deductions. He then argues that the multi-life discount does not preclude application of the safe harbor provision because he has been insured under the Paul Revere Policy for 20 years, only two months of which was he employed by the DS Group, and defendants have not asserted that he would not have been eligible for the discount had he applied for the policy while self-employed.

Courts in the Fifth Circuit and elsewhere have held that, even when employees pay their own premiums, an employer nevertheless "contributes" for purposes of the safe harbor provision if the employees benefit from a rate structure or premium discount the employer was able to negotiate in obtaining group benefits. *E.g., House*, 499 F.3d at 449 ("while the partners paid their own premiums for the optional disability coverage, they benefited from the unitary rate structure the firm was able to negotiate by bargaining for disability coverage as a package for all classes [and they] therefore effectively received a premium discount or constructive contribution from the firm."); *see also, e.g.*, *Healy v. Minn. Life Ins. Co.*, 2012 WL 566759, at *5 (W.D. Mo. Feb. 21, 2012) (noting that courts are divided on whether Safe Harbor provision applies if discount is given as a result of employer's involvement, but concluding that 10% discount attributed to plaintiff by virtue of employer's agreement to transmit plaintiff's premium payments on policy was a "contribution" because employer provided plaintiff a benefit he could not have received individually); *Harding v. Provident Life & Acc. Ins. Co.*, 809 F.Supp.2d 403, 418 (W.D. Pa. 2011) ("when discounted premiums

are offered to a group of employees, the Safe Harbor regulations are not applicable and ERISA governs").

The court concludes as a matter of law that the 15% discount applied to the Paul Revere Policy by virtue of the policy's being list-billed and included in DS Group's ESP is a "contribution" for purposes of removing the policy from the Safe Harbor provision of 29 C.F.R. § 2510.3-1(j). Dr. Henderson does not dispute that he received the 15% multi-life discount because he purchased the Paul Revere Policy together with other employees of DS Group as part of the ESP. Instead, he argues that "Defendants' evidence suggests that [he] would have received a discount on the Paul Revere Policy if any employer assumed the task of paying the premiums and that the premium discount is not solely tied to [his] relationship with DS Group." P. 8/3/12 Br. 20. The court holds that a reasonable trier of fact could only find from the summary judgment evidence that Dr. Henderson received a 15% multi-life discount because he purchased the Paul Revere Policy together with other employees of DS Group as part of the ESP. Whether he could have received a similar discount "if any employer assumed the task of paying the premiums" is irrelevant to the question whether DS Group provided a "contribution" to Dr. Henderson in the form of a benefit that he would not have received had he not been an employee. The undisputed evidence establishes such a "contribution." Accordingly, a reasonable trier of fact could only find that the Safe Harbor's exclusionary provision does not apply.

3

The third prong of the test focuses on whether the plan was "establish[ed] or maintain[ed] by an employer intending to benefit employees." *Meredith*, 980 F.2d at 355. This is often parsed into two elements "(1) whether the employer established or maintained the plan, and (2) whether the employer intended to provide benefits to its employees." *Shearer v. Sw. Serv. Life Ins. Co.*, 516 F.3d 276, 279 (5th Cir. 2008). To determine whether an employer "established or maintained" an employee benefit plan, "the court should focus[] on the employer . . . and [its] involvement with the administration of the plan." *Gahn v. Allstate Life Ins. Co.*, 926 F.2d 1449, 1452 (5th Cir. 1991).

Defendants argue that DS Group established or maintained an ERISA plan to provide disability, life, and health insurance, of which the Paul Revere Policy was one part. They maintain that DS Group provided its employees with certain benefits—including health insurance, life insurance, disability benefits through a group disability policy issued by Unum Life Insurance Company of America ("Unum Policy"), voluntary disability benefits through individual disability policies issued by Paul Revere, and a cafeteria plan—through the DSC Trust. They posit that the Unum Policy and the ESP, of which the Paul Revere Policy was a part, included employees other than Dr. Henderson, and that DS Group remitted the premium for Paul Revere Policy through a list bill. They contend that, as a result, Dr. Henderson's premiums on his Paul Revere Policy were discounted by 15%. Finally, they adduce evidence that DS Group's accounting department handled premium billing issues for

the Paul Revere Policy, including monitoring and receiving the premium statements, ensuring that premiums were timely paid, communicating with the insurance companies as necessary, and handling the bookkeeping functions to charge back any employee-paid premiums.

Dr. Henderson responds that the plan cannot be said to have been established or maintained to benefit employees. He posits that the policy covered only him, that he is not an employee but is the owner of Second Henderson PA for purposes of this inquiry, and that his policy was not part of a larger plan. In support, he argues that the Paul Revere Policy is distinct from both the DSC Trust and the other Paul Revere policies. He maintains that defendants have failed to provide any credible evidence to substantiate their claim that the Paul Revere Policy was established by DS Group as part of the DSC Trust, and that the Paul Revere Policy differed from the policies Paul Revere issued to his coworkers.

The summary judgment record only permits the reasonable finding that DS Group established and maintained the Paul Revere policy for the benefit of its employees. Although the parties quarrel about whether the policy is linked to the DSC Trust, the key question is whether the Paul Revere Policy was part of a plan that DS Group established or maintained. There is ample evidence that it was.

As defendants maintain, this case is analogous to *Sharpless*. In *Sharpless* the employer "provided disability insurance benefits for all employees, including shareholder employees, through a group policy paid for by the corporation and individual policies which

could only be obtained by shareholders." *Sharpless*, 253 F.Supp.2d 874, 878 (M.D. La. 2003), *aff'd*, 364 F.3d 634 (5th Cir. 2004).   When the shareholder-plaintiff obtained an individual policy, the corporation paid premiums directly to the insurer, but it included the payments as part of the doctor's taxable income, and the corporation handled all administrative details.  *Id.* at 879.   The district court held that the plaintiff's plan was governed by ERISA, and the Fifth Circuit affirmed .

Here, DS Group established the DSC Trust that provided disability benefits to many employees through the Unum Policy, but it also permitted certain employees to obtain voluntary disability benefits through individual policies from Paul Revere.  These voluntary individual plans were part of the DSC Trust, which was intended to benefit employees through an array of benefits programs.  Dr. Henderson's application for the Paul Revere Policy specifically provided that his policy would be a "combo with non Paul Revere LTD-group plan."  Ds. 6/27/12 App. 73.  And Dr. Henderson obtained the policy after attending a meeting with DS Group's insurance agent for the Unum Policy—a meeting that the Executive Director of DS Group facilitated and attended for an unspecified amount of time. Dr. Henderson and four other physicians obtained their individual policies as part of the ESP.  DS Group remitted premiums for both the Unum Policy and Paul Revere Policy through a list bill and handled various billing issues associated with the policies, although the premiums were charged to Dr. Henderson through a payroll deduction.  Finally, the Paul Revere Policy was part of DS Group's ESP, thus entitling Henderson to a 15% discount to

which he would not have been entitled had he obtained the policy individually.  This amounts to "some meaningful degree of participation by [DS Group] in the creation or administration of the plan," and an "intent to provide its employees with a welfare benefit plan." *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 978 (5th Cir. 1991).  In short, DS Group not only helped establish the plan but was highly "involve[d] with the administration of the plan." *Gahn*, 926 F.2d at 1452.[9]

Dr. Henderson disagrees that the instant case is analogous to *Sharpless*, but he does so primarily on the basis that *Sharpless* involved a group of shareholders who, the court held, could be treated as employees for purposes of ERISA because they were multiple.  He cites *Heral v. Unum Life Insurance Co. of America*, 2008 WL 5000190 (E.D. Ark. Nov. 18, 2008), for the proposition that, where a plan benefits only an employer, it is not an ERISA plan.  The fundamental flaw with this argument is that Dr. Henderson was undisputedly an employee of DS Group when the Paul Revere Policy issued.  It appears that, in attempting to distinguish *Sharpless*, Dr. Henderson improperly transfers his argument that the plan converted to a non-ERISA plan into the analysis of whether the plan began as an ERISA plan.

4

Dr. Henderson argues that, even if the Paul Revere Policy was originally governed by ERISA, the policy lapsed, and, on reinstatement, it became a non-ERISA plan.

_____

[9]Further, ERISA specifically envisions that an employer can establish an employee welfare benefit plan "through the purchase of insurance or otherwise."  29 U.S.C. § 1002(1).

Numerous courts have held that, when an employee converts an ERISA plan to an individual plan that covers only the employee as an individual, not as an employee of his former employer, the converted policy is not an ERISA plan. *See, e.g., Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 875 (9th Cir. 2001) ("An employee benefit plan must cover at least one employee to constitute an ERISA benefit plan.  [Plaintiff's] converted policy covered her as an individual and not as an employee of SCS or of any other employer.  Her converted policy is therefore not itself an ERISA plan." (citations omitted)); *Demars v. CIGNA Corp.*, 173 F.3d 443, 445-50 (1st Cir. 1999) (private long-term disability insurance policy obtained by former employee, after termination of employment, through exercise of employee's conversion rights as granted by employee welfare benefit plan was not itself an "employee welfare benefit plan" subject to ERISA); *Shelton v. Standard Ins. Co.*, 2008 WL 2067024, at *4 (E.D. La. May 14, 2008) (holding that conversion policy was not subject to ERISA preemption because, under Fifth Circuit's three-part test, employee independently and voluntarily chose to establish insurance under conversion policy following termination of his employment, employee paid all premiums directly to insurer, and there was no evidence former employer had any further involvement with administration of policy because former employer had closed).  In each of these cases, however, the employees had converted a group policy into an individual policy pursuant to a conversion clause contained in the original policy.

In this case, it is undisputed that the Paul Revere Policy contains no conversion

- 24 -

clause.  It is also undisputed that the "reinstated" policy, on which Dr. Henderson bases his

breach of contract claims, is the same as the original policy.  Courts in this and other circuits

have explained that "conversion" only occurs when

> an ERISA plan participant leaves the plan and obtains a new,
> separate, individual policy based on conversion rights contained
> in the ERISA plan.  The contract under the converted policy is
> directly between the insurer and insured.  It is independent of
> the ERISA plan and does not place any burdens on the plan
> administrator or the plan.   There are also no relevant
> administrative actions by the employer.

*Owens v. Unum Life Ins. Co.*, 285 F.Supp.2d 778, 783 (E.D. Tex. 2003) (quoting *Waks*, 263

F.3d at 876).[10]   There is no evidence, and Dr. Henderson does not argue, that, upon

reinstatement, a new, separate, individual policy was created.  Indeed, there was no reason

to convert the policy from a group policy to an individual policy because it was issued as an

individual policy.  *See, e.g., Alexander v. Provident Life & Accident Ins. Co.*, 663 F.Supp.2d

627, 636 (E.D. Tenn. 2009).  Instead, the policy number and effective date remained the

---

[10]*See also Alexander v. Provident Life & Accident Ins. Co.*, 663 F.Supp.2d 627, 636
(E.D. Tenn. 2009):

> This is not a situation involving an individual conversion policy,
> but rather a continuation of the identical coverage under
> identical terms as initially acquired by virtue of the previous
> employment relationship. Plaintiff continued to pay the same
> monthly premiums, including the discount originally offered
> through Associates.  He completed a form indicating he wanted
> to continue coverage and his policy remained unchanged other
> than the manner in which it was billed. Furthermore, his policy
> was originally set up as an individual policy under the
> Associates' Group and there was no need for conversion from
> a group policy to an individual policy[.]

- 25 -

same post-employment, Dr. Henderson continued to benefit from the 15% multi-life discount, and neither his premiums nor the terms of his policy changed.

Dr. Henderson maintains that the reinstated policy should be treated as if it had been converted based on the policy considerations underlying the treatment of converted policies as not being governed by ERISA.  But he has not cited, nor has the court found, any case in which a court has treated a policy as "converted," for purposes of determining whether ERISA applied, when the policy actually was not a *converted* policy but was instead a *continued* policy.  In fact, courts recognize the difference between continuation of benefits and conversion policies, and have suggested that the two types of plans should be treated differently for purposes of ERISA preemption.  *See*, *e.g.*, *Mass. Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997) (holding that ERISA governed where policy was not converted but was instead continued under same terms after employee assumed premium payments that were previously funded by employer); *Goldman v. BCBSM Found.*, 2012 WL 1340438, at *4 (E.D. Mich. Apr. 18, 2012) (holding that ERISA preemption applied where there were no allegations that settlement agreement created conversion policy, that ERISA plan contained procedure for conversion, that those procedures were followed, or that new and separate policy was created that was different from terms of ERISA plan); *Mastaler v. Unum Life Ins. Co.,* 2012 WL 579537, at *3 (S.D. Cal. Feb. 22, 2012) ("where there is a continuation policy rather than a converted policy, ERISA still applies"); *Sullivan v. Paul Revere Life Ins. Co.*, 2010 WL 8510501, at *8-9 (N.D. Ala. May 28, 2010) (holding that

where plan was initially ERISA plan and policy involved continuation of benefits and was not conversion policy, ERISA continued to govern policy).  Because the Paul Revere Policy was not converted into a new policy after it lapsed, but was, instead, continued, and because the Paul Revere Policy is part of an "employee welfare benefit plan" governed by ERISA, the court concludes that the policy continued to be covered by ERISA after it was reinstated.

## V

Having determined that the Paul Revere Policy is part of an ERISA plan, the court next addresses whether ERISA preempts Dr. Henderson's state-law claims that are based on this policy.  Defendants argue Dr. Henderson's state-law breach of contract claim is subject to both conflict and complete preemption under ERISA.

## A

Under ERISA, there are two types of preemption.  "Complete preemption" arises under ERISA § 502—the statute's civil enforcement provision.[11]  A state-law claim that is completely preempted by § 502 is transformed into a new federal claim under that section, and thereby gives a federal court subject matter jurisdiction over the claim as a federal question.  *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-08 (2004).  It is well established that Congress intended that ERISA fully occupy the field of disputes involving employee welfare benefit plans.  *See, e.g., Westfall v. Bevan*, 2009 WL 111577, at *3 (N.D.

---

[11]The pertinent section in this case is § 502(a)(1)(B), which preempts all suits involving ERISA-governed plans "brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Tex. Jan. 15, 2009) (Fitzwater, C.J.). Therefore, "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Aetna Health*, 542 U.S. at 210. "Put simply, there is complete preemption jurisdiction over a claim that seeks relief 'within the scope of the civil enforcement provisions of § 502(a).'" *Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003) (en banc) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987)).

The other form of ERISA preemption—"conflict preemption"—arises under ERISA § 514. Section 514 provides that "the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA] plan[.]" 29 U.S.C. § 1144(a). "Conflict preemption, also known as ordinary preemption, arises when a federal law conflicts with state law, thus providing a federal defense to a state law claim, but does not completely preempt the field of state law so as to transform a state law claim into a federal claim." *Arana*, 338 F.3d at 439. Preemption of state-law claims under § 514 "provides an affirmative federal defense to a state-law claim." *Westfall*, 2009 WL 111577, at *4 (citing *Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 337 (5th Cir. 1999)). Thus if state-law claims "relate to" an ERISA plan—whether asserted in state or federal court—ERISA supersedes state law and the claims must be dismissed. *See, e.g.*, *Menchaca v. CNA Group Life Assurance Co.*, 331 Fed. Appx. 298, 304 (5th Cir. 2009) (per curiam)

- 28 -

(upholding dismissal of state-law claims based on § 514 preemption).

Thus while both conflict preemption and complete preemption displace state-law claims, they result in different outcomes.  Conflict preemption under § 514 is a defense and leads to the dismissal of the state-law claim.  Complete preemption under § 502 also results in dismissal of the state-law claim, but it recasts the state claim as a federal claim under ERISA.  *See, e.g., Cardona v. Life Ins. Co. of N. Am.*, 2009 WL 3199217, at *4 (N.D. Tex. Oct. 7, 2009) (Fitzwater, C.J.).

B

Because the Paul Revere Policy is part of an ERISA employee welfare benefit plan, the court considers whether Dr. Henderson's breach of contract claim based on that policy seeks to enforce his rights under the plan, and is therefore completely preempted under ERISA § 502.

Section 502 authorizes private suits "brought by a participant or beneficiary to recover benefits due to him under the terms of his plan."  "It is well established that claims for breach of contract due to unpaid benefits under an ERISA plan are preempted under § 502."  *Meyers*, 2009 WL 3756323, at *5; *see also Ellis v. Liberty Life Ins. Co. of Bos.*, 394 F.3d 262, 276 n.34 (5th Cir. 2004) (holding that, "for purposes of removal, [plaintiff's] state law breach of contract claim arose under federal law because it is one for the recovery of benefits under [§ 502]").  The court concludes that Dr. Henderson's breach of contract claim is completely preempted under ERISA § 502.  Accordingly, the court grants defendants'

motion for partial summary judgment and dismisses this claim.  Because Dr. Henderson has alternatively pleaded a claim under ERISA § 502, 29 U.S.C. § 1132(a)(1), there is no need to grant him leave to replead his claim under ERISA.

VI

The court now considers defendants' second motion, in which they seek summary judgment establishing that Dr. Henderson is not "totally disabled" under either the Great West Policy or the Paul Revere Policy.

A

The Great West Policy requires that, to be "totally disab[led]," Dr. Henderson must be unable to "work at the main duties" of his "regular occupation," he must not be working at any other occupation, and he must be under the care of a physician.  Ds. 10/18/12 App. 20.  The Paul Revere Policy requires that, to be "totally disabled," Dr. Henderson must be "unable to perform the important duties" of his occupation and must be "receiving Physician's Care."  *Id.* at 35.

Defendants argue, *inter alia*, that because Dr. Henderson has continued to perform some, if not all, of the "main" or "important" duties of his occupation, he is not totally disabled under the Great West Policy or the Paul Revere Policy.  They maintain that Dr. Henderson has continued to perform, on at least a part-time basis, all of the duties of his pre-disability occupation, including performing major surgeries.  They contend that even if, as Dr. Henderson argues, his occupation has been limited to the sole duty of independently

performing spine surgery, his "continuing to practice as a spine surgeon and his ongoing performance of both major and minor surgeries, assisted and unassisted, is alone sufficient to disqualify him from total disability" under both policies.  Ds. 10/18/12 Br. 21-22.

Defendants also posit that Dr. Henderson is not "Totally Disabled" because he is not receiving regular and appropriate care of a physician.  They argue that Dr. Henderson and his certifying physician, Charles Crane, M.D. ("Dr. Crane"), admit that Dr. Crane has not provided treatment, care, or even recommendations for care.  Defendants maintain that, under the unambiguous terms of the Great West and Paul Revere Policies, Dr. Henderson has failed to obtain the regular and appropriate care of a physician.

Dr. Henderson responds that the definition of "Total Disability" in both policies is ambiguous.  He posits that this is so because, in providing that he must not be able to work at "*the* main duties" of his regular occupation or "*the* important duties" of his occupation, the policies do not specify whether he must be unable to perform "all" of the main or important duties of his occupation to be totally disabled, or must merely be unable to perform "any" or "some" of the main or important duties of his occupation.  Dr. Henderson argues that the policies must be construed in his favor, as the insured, so that he is not required to establish that he is unable to perform "all" of the important duties of his profession in order to be "totally disabled."  He posits that his "regular occupation" is that of a spine surgeon and that tasks such as performing minor procedures, such as injections, and conducting office visits do not constitute the "important duties" of his occupation as a

spine surgeon, but rather are incidental to his surgery practice.  He maintains that he is not able to physically perform surgery without the "constant companionship of a co-surgeon." P. 11/8/12 Br. 12; *see also id.* ("Due to his disabling conditions, Dr. Henderson lacks the strength and coordination to continue performing spine surgeries in a surgical suite without the help of a co-surgeon.").  Thus he maintains that he is "Totally Disabled."

As to the argument that his claim for total disability benefits is barred because he is not receiving regular and appropriate care, Dr. Henderson argues that he sought and accepted appropriate care for his disabling condition from Dr. Crane.

## B

Texas courts[12] interpret insurance policies according to the rules of contract interpretation.  *See, e.g., Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts."). When a "contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law."  *Int'l Ins.*, 426 F.3d at 291; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). "In applying these rules, a court's primary concern is to ascertain the parties' intent as

---

[12]The court has not conducted a complete choice-of-law analysis because it is unnecessary.  For purposes of deciding this motion, the court assumes that Texas law governs the interpretation of the Great West Policy because Dr. Henderson seeks attorney's fees under Texas law and defendants cite Texas law in support of their contract arguments.

expressed in the language of the policy." *Int'l Ins.*, 426 F.3d at 291; *see also Forbau*, 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent."). The court must give effect to all of a policy's provisions so that none is rendered meaningless. *Int'l Ins.*, 426 F.3d at 291.

"Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Int'l Ins.*, 426 F.3d at 291 (citing *Kelley-Coppedge*, 980 S.W.2d at 464). "If an insurance contract uses unambiguous language, [the court] must enforce it as written. If, however, a contract is susceptible to more than one reasonable interpretation, [the court] will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (footnotes omitted); *see also Nat'l Union*, 811 S.W.2d at 555.

## C

The court considers first whether defendants are entitled to summary judgment establishing that Dr. Henderson is not "Totally Disabled" under the terms of the Great West Policy.

## 1

The Great West Policy unambiguously requires that, for Dr. Henderson to be "Totally Disabled," he must be unable to work at the "main duties" of his regular occupation which, in this case, is that of a spine surgeon. Whether Dr. Henderson is able to work at the "main

duties" of his occupation is a question of fact.

Dr. Henderson argues that it is undisputed that his occupation is that of a spine surgeon and that the primary function and important duty of a spine surgeon is to perform spine surgeries.  In support, he cites the opinion of his expert, John A. Malonis, M.D. ("Dr. Malonis"), an orthopaedic surgeon, that "[p]erforming [surgeries as an independent spine surgeon] is an important/main duty—if indeed not *the* important/main duty—of a spine surgeon."  P. 11/8/12 App. 24 (emphasis in original).  Dr. Henderson concedes that he is able to perform minor procedures, such as injections, and is able to conduct office visits.  He argues, however, that these duties do not constitute the "main duties" of his occupation as a spine surgeon, but rather are incidental to his surgery practice.  Dr. Henderson testified by deposition that the following are *not* the "primary functions of a spine surgeon": examining and talking with patients, taking histories from patients, physically examining and manipulating patients' arms, prescribing X-rays and MRIs, diagnosing patients' problems, and prescribing therapy.  *Id.* at 29-30.  Dr. Henderson also relies on Dr. Malonis' affidavit, in which he details the physical demands of spine surgery and concludes, based on Dr. Henderson's bilateral carpal tunnel condition, that "[Dr. Henderson] is no longer able to perform surgeries as an independent spine surgeon."  *Id.* at 22-24.

The court holds that a reasonable jury could find based on this evidence that the performance of independent spine surgery is a "main" duty of Dr. Henderson's occupation, and that, as a result of Dr. Henderson's physical disabilities, he is unable to work at this duty.

2

The Great West Policy also requires that, for Dr. Henderson to be "Totally Disabled," he must not be working at any other occupation.  Defendants argue that Dr. Henderson cannot satisfy this requirement because "[u]nder his own theory, if [Dr.] Henderson's continuing to work at his office practice, his administrative duties, his co-surgery, and his other 'incidental' duties constitute working at another occupation, he is not entitled to total disability benefits under the Great West Policy as a matter of law."  Ds. 11/20/12 Reply 7. In other words, defendants posit that, if Dr. Henderson maintains that his only "main" duty is performing independent spine surgeries, his performance of non-surgery tasks must constitute working at another occupation.

This argument lacks force.  The Great West policy defines "Occupation" as "any occupation for which you receive or are entitled to receive Earned Income." P. 11/8/12 App. 58.  The undisputed evidence establishes that Dr. Henderson is currently working, and receives "Earned Income," as a spine surgeon.  His argument that performing surgery is the "main" duty of his occupation, and that other non-surgical tasks, such as performing minor procedures and conducting office visits, are merely "incidental" to his surgery practice, does not convert these other tasks into a separate "occupation" under the Great West Policy.

3

Finally, the Great West Policy requires, that to be "Totally Disabled," Dr. Henderson must be "under the care of a physician."  Ds. 10/18/12 App. 20.  Dr. Henderson has

introduced evidence that his physician, Dr. Crane, has examined him at least annually, that Dr. Crane determined that he had a permanent disabling condition, and that Dr. Crane recommended that he stop performing surgeries without the use of a co-surgeon.  Dr. Henderson also cites Dr. Crane's deposition testimony that conservative treatment typically used to treat carpal tunnel disease would not work in this instance because it would not address Dr. Henderson's secondary problem of thoracic outlet syndrome.  The court concludes that this evidence is sufficient to permit a reasonable jury to find that Dr. Henderson has satisfied the requirement that he be "under the care of a physician."

Because Dr. Henderson has produced evidence sufficient to create a genuine issue of material fact on each of the requirements for "Total Disability" under the Great West Policy, defendants are not entitled to summary judgment establishing that Dr. Henderson is not "Totally Disabled" under this policy.

## D

The court next considers defendants' second motion for summary judgment as it applies to the Paul Revere Policy.

The court has held above that the Paul Revere Policy is subject to ERISA.  "A plan participant who is denied benefits under an ERISA plan can sue to recover them."  *Leake v. Kroger Texas, L.P.*, 2006 WL 2842024, at *4 (N.D. Tex. Sept. 28, 2006) (Fitzwater, J.) (citing 29 U.S.C. § 1132(a)(1)(B)).  This court has jurisdiction to review determinations made by an ERISA employee benefit plan.  *See Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d

287, 295 (5th Cir. 1999) (en banc), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).  In reviewing a decision by an ERISA plan administrator, factual determinations are given deference and are reviewed only for abuse of discretion. *Vercher v. Alexander & Alexander Inc*., 379 F.3d 222, 226 (5th Cir. 2004).  "[F]or factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard; that is, federal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment."  *So. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993) (internal quotation marks omitted).

Defendants seek summary judgment establishing that Dr. Henderson is not "totally disabled" under the Paul Revere Policy.  They acknowledge in a footnote that, "[i]f the Policies are governed by ERISA, the Court must decide the same legal issue[—whether Dr. Henderson is totally disabled under the Policies as a matter of law—], but it will be in the context of its abuse of discretion review." Ds. 10/18/12 Br. 15 n.8.  But defendants have not yet sought summary judgment on the basis that the plan administrator's decision that Dr. Henderson was not "totally disabled" was not an abuse of discretion.  Because the court must conduct an abuse of discretion review, and because defendants have not moved for summary judgment under the ERISA standard, the court denies defendants' motion in this respect.  It will instead decide the question on the administrative record, under a procedure agreed to by the parties or prescribed by the court.[13]

_____

[13]If this case involved only a claim governed by ERISA, the court would typically decide it on the papers, with or without oral argument.  Here, however, Dr. Henderson's

- 37 -

VII

The court raises *sua sponte* that Dr. Henderson's declaratory judgment claim (which remains as to the Great West Policy) should be dismissed.[14]

The federal Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, does not create a substantive cause of action. *See Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("The federal Declaratory Judgment Act . . . is procedural only[.]") (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). A declaratory judgment action is merely a vehicle that allows a party to obtain "an early adjudication of an actual controversy" arising under other substantive law. *Collin Cnty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 170 (5th Cir. 1990). Federal courts have broad discretion to grant or refuse declaratory judgment. *See, e.g., Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991). "Since its inception, the [DJA] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The DJA is "an authorization, not a command." *Pub.*

---

state-law breach of contract claim concerning the Great West Policy remains to be tried to a jury. The court will therefore give the parties an opportunity to suggest a procedure that is fair and convenient to both sides, considering that part of the case will involve a jury trial.

[14]The court can raise *sua sponte* that summary judgment is warranted on a particular claim, provided it affords the nonmovant notice and a fair opportunity to file an opposition response. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *9 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) (citing *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 445 (5th Cir. 1991)).

*Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962).  It gives federal courts the competence to declare rights, but it does not impose a duty to do so.  *Id.* (collecting cases).

The court, in its discretion, declines to adjudicate Dr. Henderson's declaratory judgment claim as to the Great West Policy[15] because it is duplicative of his state-law contract claim, which this court has already addressed.  *See, e.g., Metcalf v. Deutsche Bank Nat'l Trust Co.*, 2012 WL 2399369, at \*9 (N.D. Tex. June 26, 2012) (Fitzwater, C.J.) (noting that declaratory judgment action should be dismissed because it duplicated plaintiffs' quiet title claim); *Kougl v. Xspedius Mgmt. Co. of DFW, L.L.C.*, 2005 WL 1421446, at \*4 (N.D. Tex. June 1, 2005) (Fitzwater, J.) (denying as redundant a declaratory judgment claim seeking contract interpretation where this would be resolved as part of breach of contract action); 6 Charles Alan Wright, et al., *Federal Practice & Procedure* § 1406, at 30–31 (3d ed. 2010) ("When the request for declaratory relief brings into question issues that already have been presented . . . a party might challenge the counterclaim on the ground that it is redundant and the court should exercise its discretion to dismiss it.").  Dr. Henderson may file an opposition response, brief, and appendix within 21 days of the date this memorandum opinion and order is filed.  The court will evaluate the papers before deciding whether to invite defendants to file a reply.

---

[15]The claim that relates to the Paul Revere Policy is preempted under ERISA.  Even if it were not, the court would decline in its discretion to adjudicate it.

*   *   *

Accordingly, for the reasons explained, the court grants in part and denies in part defendants' June 27, 2012 motion for determination of applicability of ERISA and to dismiss preempted claims; denies Dr. Henderson's August 3, 2012 objections to and motion to strike defendants' summary judgment evidence; and denies defendants' October 18, 2012 motion for partial summary judgment.  The court raises *sua sponte* that Dr. Henderson's declaratory judgment action as to the Great West Policy should be dismissed.

**SO ORDERED**.

April 19, 2013.

SIDNEY A. FITZWATER
CHIEF JUDGE